Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
OATA-2023-131[1]

| | | |
|---|---|---|
| ERNESTO RIVERA BURGOS, PURIFICACIÓN RIVERA, ERNESTO RIVERA RIVERA Y MARÍA T. RIVERA RIVERA<br><br>Recurrentes<br><br>Vs.<br><br>DEPARTAMENTO DE DESARROLLO ECONÓMICO Y COMERCIO, OFICINA DE GERENCIA DE PERMISOS (OGPe); AT & T MOBILITY OF PUERTO RICO (AHORA LIBERTY PUERTO RICO)<br><br>Recurridos | KLRA202300201 | *REVISIÓN ADMINISTRATIVA* procedente de la Oficina de Gerencia de Permisos (OGPe)<br><br>Revisión número:<br><br>2023-472218-SDR-011389<br><br>Caso número:<br><br>2020-323102-PCOC-028873<br><br>Sobre:<br><br>Permiso de Construcción para Facilidad de Telecomunicaciones |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Jueza Rivera Marchand y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 23 de febrero de 2024.

Comparecen las partes recurrentes, el Sr. Ernesto Rivera Burgos, Sra. Purificación Rivera, Sr. Ernesto Rivera Rivera y María Rivera Rivera (en adelante y en conjunto, los "Recurrentes"), solicitando la revisión de la *Resolución de Recurso de Revisión Administrativa* emitida por la División de Revisiones Administrativas de la Oficina de Gerencia de Permisos (en adelante, "DRA-OGPe"), emitida y notificada el 4 de abril de 2023, en la cual declaró "No Ha Lugar" el recurso de revisión a la enmienda al permiso de construcción presentada por los Recurrentes.

---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución de la Juez Waleska I. Aldebol Mora.

Por los fundamentos que expondremos a continuación, se revoca la Resolución de Revisión Administrativa emitida por la DRA-OGPE.

## I.

El 4 de enero de 2023, los Recurrentes presentaron Recurso de Revisión Administrativa ante la DRA-OGPe. En síntesis, alegaron que la expedición de la enmienda al permiso de construcción Núm. 2020-323102-PCOC-028873 (en adelante "enmienda") fue otorgado sin cumplir con los requisitos establecidos por el Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios (en adelante "Reglamento Conjunto 2020"). Según arguyen, AT&T Mobility of Puerto Rico, LLC. (en adelante "Liberty") enfrentaron problemas con la fundación del proyecto inicial por lo que solicitaron enmiendas al permiso original para cambiar la fundación de su construcción y triplicar el volumen y área de remoción de corteza terrestre e impacto a un área que ya era de alta susceptibilidad a deslizamientos según el United States Geological Survey (en adelante, "USGS"). Sostienen que la OGPe otorgó esta enmienda sin consultar la ubicación ni evaluación ambiental.

Narran los Recurrentes que, para el mes de febrero de 2019, el Sr. Rivera Burgos y su esposa Rivera le compraron mediante escritura de compraventa al Sr. Ángel Manuel Otero Pagán, ex alcalde del municipio de Ciales, la parcela en la que residen hoy en día. Ahora bien, en septiembre y octubre de 2019, el Sr. Otero Pagán suscribió un contrato de arrendamiento con Liberty en el cual arrendó una parcela cercana a la de los Recurrentes para la colocación de una torre de telecomunicaciones. Siendo así, el 22 de diciembre de 2021, OGPe otorgó el permiso original número 2020-323102-PCOC-017325 a Liberty. No obstante, en julio de 2022, la

Junta de Planificación realizó una inspección a la obra de construcción como parte de una querella realizada. Es a raíz de dicha inspección que Liberty solicita enmiendas al permiso original. En la solicitud aclara que es necesario modificar el tipo de fundación a ser utilizada a micro-pilotes, reubicar las losas de piso a hormigón y aumentar el área de impacto de movimiento de tierra. El 15 de septiembre de 2022, los recurrentes recibieron una carta del Recurrido en la que les notifica sobre la solicitud de enmiendas al permiso original. Según alegan, Liberty no les informó de todos los cambios, solamente informaron que cambiarían el diseño estructural de la fundación de la torre, la geometría del piso y que reducirían el piso y el área de construcción.

Posterior a la notificación, en septiembre de 2022, Puerto Rico sufrió los estragos del Huracán Fiona. Como consecuencia, las lluvias torrenciales provocaron un deslizamiento de terreno en la finca donde se encuentra la residencia de los Recurrentes y la torre de comunicaciones. Sin embargo, el 15 de diciembre de 2022, OGPe autorizó la enmienda número 2020-323-102-PCOC-028873 al permiso de construcción original. Los Recurrentes sostienen que la construcción se realizará en terreno susceptible y de alta probabilidad de deslizamiento según el USGS. Alegan que, del expediente administrativo no surge que se haya realizado una evaluación ambiental y que, además, no se cumplieron con los requisitos de forma de la Regla 118 y 120 del Reglamento para el proceso de Evaluación Ambiental, JCA de 23 de noviembre de 2016, Reglamento Núm. 8858. Arguyen que, del expediente solo surge un estudio de suelo realizado para expedir el permiso original, para el cual se utilizó información del USGS del 1966.

En atención al Recurso de Revisión Administrativa presentado por los Recurrentes, el 3 de febrero de 2023, Liberty presentó "Moción de Desestimación por Falta de Jurisdicción". Sin

atender la Moción presentada el 9 de febrero de 2023, se celebró una vista en la que todas las partes estuvieron de acuerdo en que no se llevara a cabo el descubrimiento de prueba por no existir controversias de hechos, solo de derecho. Así la cosas, DRA-OGPe les otorgó a las partes hasta el 16 de marzo de 2023 para presentar memorando de derecho sobre las alegaciones.

Ante ello, el 16 de febrero de 2023 Liberty presentó Moción Suplementaria a su solicitud de desestimación. Por su parte, el 16 de marzo de 2023, los Recurrentes presentaron memorandos de derecho. Finalmente, el 4 de abril de 2023, DRA-OGPe emitió Resolución de Revisión Administrativa en la que declaró "No Ha Lugar" el recurso presentado. Por su parte, determinó que los señalamientos correspondientes al permiso original no podían ser revisados puesto a que había sido otorgado el 22 de diciembre de 2021, por lo que era final y firme y se presume su corrección. Concluyó, además, que la solicitud de la enmienda al permiso cumple con lo requerido por el Reglamento.

Inconforme con la determinación, el 4 de mayo de 2023, los Recurrentes presentaron el Recurso de Revisión Judicial que nos ocupa e imputaron la comisión de los siguientes errores:

**PRIMER SEÑALAMIENTO: ERRÓ LA DRA-OGPE AL AVALAR LA OTORGACIÓN DE ENMIENDA A PERMISO PARA UNA TORRE DE TELECOMUNICACIONES, QUE TRIPLICÓ EL ÁREA DE TERRENO A SER IMPACTADA Y CUADRIPLICÓ LA CANTIDAD DE CORTEZA TERRESTRE A SER REMOVIDA, EN TERRENO CLASIFICADO CON UNA SUSCEPTIBILIDAD ALTA Y MUY ALTA A DESLIZAMIENTO SEGÚN EL USGS, CONTRAVINIENDO LA PROHIBICIÓN EXPRESA DE LA SEC. 9.11.2.3(B) ANTE, SIN SIQUIERA CELEBRAR UNA CONSULTA DE UBICACIÓN PARA VARIACIÓN, SIENDO QUE NO ES UN USO PERMITIDO PARA DICHA CLASIFICACIÓN DE TERRENO.**

**SEGUNDO SEÑALAMIENTO: ERRÓ LA DRA-OGPE AL CONCLUIR QUE LA SOLICITUD DE QMC, Y LA OGPE AL EVALUAR Y APROBARLA, "CUMPLE CON LAS DISPOSICIONES ANTES CITADAS PARA SER CONSIDERADO COMO UNA ENMIENDA" CUANDO**

**INCUMPLE CON LOS REQUISITOS EXIGIDOS PARA TODA SOLICITUD, COMO LA EVALUACIÓN AMBIENTAL Y PERMISOS ADICIONALES REQUERIDOS, Y LOS REQUISITOS ESPECÍFICOS DE LA SEC. 9.11.4.2, REGLAMENTO CONJUNTO 2020.**

**TERCER SEAÑALAMIENTO: ERRÓ LA DRA-OGPE AL VALIDAR LA EXPEDICIÓN POR LA OGPE DE LA ENMIENDA AL PERMISO ORIGINAL, QUE ALTERÓ ESTRUCTURALMENTE LA FUNDACIÓN DE LA CONSTRUCCIÓN, DUPLICÓ LA SUPERFICIE DE TERRENO A SER REMOVIDA, CUADRUPLICÓ EL VOLUMEN DE CORTEZA A SER REMOVIDA Y TRIPLICÓ EL ÁREA DE IMPACTO, COMO UN [SIC] SIMPLE ENMIENDA AL PERMISO CUANDO, DE UNA INTERPRETACIÓN HERMENÉUTICA ENTRE LA SEC. 9.11.4.2 (PARA CAMBIO O ALTERACIÓN ESTRUCTURAL) Y LA SEC. 9.11.10.2 (PARA ENMIENDAS A PLANOS), AMBAS DEL REGLAMENTO CONJUNTO 2020, Y LA REGULACIÓN FEDERAL AL RESPECTO, QUE OCUPA EL CAMPO, SE COLIGE QUE EL CAMBIO O ALTERACIÓN ESTRUCTURAL DE TAN GRANDE ENVERGADURA REQUIERE DE UN NUEVO PERMISO.**

Habiendo comparecido las partes y presentado sus respectivos escritos, damos por perfeccionado el presente recurso y procedemos a exponer el derecho aplicable.

II

**A. *Deferencia Administrativa***

El objetivo principal de la revisión judicial se enfoca en garantizar que las agencias administrativas actúen conforme a las facultades concedidas por ley.[2] Constituye una norma reiterada por el Tribunal Supremo de Puerto Rico que los tribunales apelativos deben conceder deferencia a las determinaciones de las agencias administrativas por la experiencia y conocimiento especializado que éstas poseen sobre los asuntos ante su consideración y que por ley se les ha delegado.[3] Por ello, las determinaciones de las agencias administrativas gozan de una

---

[2] *Hernández Feliciano v. Mun. de Quebradillas*, 211 DPR 99, 113 (2023); *Oficina de Ética Gubernamental v. Martínez Giraud*, 209 DPR 79, 88 (2022).

[3] *Hernández Feliciano v. Mun. de Quebradillas*, *supra*; *Oficina de Ética Gubernamental v. Martínez Giraud*, *supra*, pág. 89; *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016).

presunción de legalidad y corrección que los tribunales deben respetar mientras que no se presente evidencia suficiente para superarla o invalidarla.[4]

La parte que impugna judicialmente una determinación de hecho de una agencia administrativa tiene el peso de la prueba para demostrar que estas no están basadas en el expediente o que las conclusiones a las que llegó son irrazonables.[5] Conforme a lo dispuesto en la sección 4.5 de la LPAU[6], las determinaciones de hechos de una agencia del Gobierno "se sostendrán si se fundamentan en evidencia sustancial que obre en el expediente administrativo."[7] A estos fines, el Tribunal Supremo ha establecido que la evidencia sustancial es "aquella prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión".[8] Empero, la aceptación no puede estar sostenida por un ligero destello de evidencia o por simples inferencias.[9]

Ahora bien, el criterio rector al momento de pasar juicio sobre la decisión de un foro administrativo es la razonabilidad de la actuación de la agencia, luego de considerar el expediente administrativo en su totalidad.[10] Consecuentemente, la revisión judicial estará limitada a evaluar si la actuación de la agencia fue arbitraria, ilegal o irrazonable, constituyendo así un abuso de discreción.[11] De este modo, el alcance del proceso de revisión se ciñe a determinar: 1) si el remedio concedido por la agencia fue el apropiado; 2) si las determinaciones de hecho de la agencia están basadas en evidencia sustancial que obra en el expediente

---

[4] *Capó Cruz v. Junta Planificación et al.*, 204 DPR 581, 591 (2020).
[5] *González Segarra et al. v. CFSE*, 188 DPR 252, 276–278 (2013); *OCS v. Universal*, 187 DPR 164, 178–179 (2012).
[6] 3 LPRA sec. 2175.
[7] *JP, Plaza Santa Isabel v. Cordero Badillo,* 177 DPR 177, 187 (2009).
[8] *Capó Cruz v. Junta Planificación et al., supra*, citando a *Rebollo v. Yiyi Motors,* 161 DPR 69, 77 (2004).
[9] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 90.
[10] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 89; *Torres Rivera v. Policía de PR, supra*, pág. 627; *Otero v. Toyota*, 163 DPR 716, 727 (2005).
[11] *Torres Rivera v. Policía de PR, supra*, pág. 626.

administrativo, y; 3) si las conclusiones de derecho fueron las correctas.[12]

Por su parte, las determinaciones de derecho pueden ser revisadas en todos sus aspectos.[13] No obstante, la revisión judicial no equivale a la sustitución automática del criterio e interpretación del organismo administrativo.[14] Los tribunales revisores descartarán el criterio de los entes administrativos cuando no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo.[15] En virtud de ello, los tribunales revisores descartarán el criterio de la agencia administrativa, en el cual cederá la deferencia administrativa, sólo cuando la agencia: 1) erró al aplicar la ley; 2) actuó arbitraria, irrazonable o ilegalmente, o; 3) lesionó derechos constitucionales fundamentales.[16]

Además, el criterio administrativo no podrá prevalecer cuando la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual se aprobó la legislación y la política pública que la promueve.[17] En ese sentido, la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia.[18] Por ende, los tribunales tienen que armonizar, siempre que sea posible, todos los estatutos y reglamentos administrativos involucrados para la solución justa de la controversia, de modo que se obtenga un resultado sensato, lógico y razonable.[19]

---

[12] *Id.*, pág. 627.
[13] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 90; *Capó Cruz v. Junta Planificación et al., supra.*
[14] *Capó Cruz v. Junta Planificación et al., supra.*
[15] *Id.*; *Rolón Martínez v. Supte. Policía, supra*, pág. 36.
[16] *Id.*; *JP, Plaza Santa Isabel v. Cordero Badillo, supra.*
[17] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, págs. 90-91.
[18] *Moreno Lorenzo v. Dept. de la Familia*, 207 DPR 833, 843 (2021).
[19] *Id.*

Por último, cabe destacar que, en el ejercicio de la función revisora de los tribunales apelativos, los foros apelativos deben diferenciar entre asuntos de interpretación estatutaria, del cual los tribunales son especialistas, y los asuntos propios de la discreción o la pericia administrativa.[20]

## B. *Doctrina del campo ocupado*

El Art. VI, cláusula 2 de la Constitución de los Estados Unidos establece la tan conocida *Cláusula de Supremacía* que dispone lo siguiente:

> Esta Constitución y las leyes de los Estados Unidos que en virtud de ella sean creadas; y todos los tratados previamente celebrados o que se celebren bajo la autoridad de los Estados Unidos serán la ley suprema de la Nación; y los jueces de cada estado estarán obligados a acatarla, aun cuando hubiere alguna disposición en contrario en la Constitución o en las leyes de cualquier Estado.[21]

Es de esta cláusula que se deriva el poder que tiene el Congreso para ocupar o adelantarse a la ley estatal. El Tribunal Supremo señala que "[l]a doctrina de campo ocupado se ha desarrollado con el propósito de evitar conflictos regulatorios entre dos gobiernos, fomentando así una política uniforme."[22] Ante esto, se entiende que hay una jurisdicción exclusiva del Gobierno Federal sobre los asuntos de derecho federal en aquellas instancias en las que el Congreso lo haya dispuesto expresamente o cuando la intención de la ley es privar de jurisdicción a los tribunales estatales sobre un asunto federal.[23] Adicionalmente, se entiende que "hay desplazamiento cuando cierto interés o propósito federal es tan dominante que no debe existir reglamentación estatal, o cuando la normativa estatal podría producir un resultado

---

[20] *Hernández Feliciano v. Mun. de Quebradillas, supra,* pág. 116; *OCS v. Point Guard Ins.,* 205 DPR 1005, 1028 (2020).

[21] Art. VI, cl. 2, Const. EE. UU.

[22] *Mun. de Peñuelas v. Ecosystems, Inc.,* 197 DPR 5, 14 (2016).

[23] *Id.,* pág. 14-15

incompatible con los objetivos federales en determinadas áreas."[24] Ante ello, cualquier ley estatal que contravenga la ley federal será nula.[25]

## C. *Ley Federal de Comunicaciones de 1996*

La ley federal de telecomunicaciones, expresamente nombrada, *Telecommunications Act of 1996*[26] es la ley federal que regula el mercado de las telecomunicaciones en los Estados Unidos. Es por esta pieza legislativa que el marco de las telecomunicaciones se considera campo ocupado por la jurisdicción federal. Sin embargo, la sección 332(c)(7)[27] de la referida ley establece lo siguiente:

### (7) Preservation of local zoning authority

#### (A) General authority

Except as provided in this paragraph, <u>nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities</u>.

#### (B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) <u>shall not prohibit or have the effect of prohibiting the provision of personal wireless services.</u>

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify

---

[24] *Rodríguez v. Overseas Military*, 160 DPR 270, 282 (2003).
[25] *Id.*
[26] Ley Púb. Núm. 104 de 8 de febrero de 1996 (110 US Stat. 56), 47 USCA sec. 151.
[27] 47 USC 332(c)(7).

personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

**(iii)** Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

**(iv)** No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

**(v)** Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

**(C) Definitions**

For purposes of this paragraph--

**(i)** the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

**(ii)** the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

**(iii)** the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses but does not mean the provision of direct-to-home satellite

services (as defined in section 303(v) of this title).[28] (Énfasis nuestro).

A tenor con lo antes expuesto, es importante señalar que la ley federal de telecomunicaciones le reserva autoridad a los estados y territorios para regular la localización y construcción de este tipo de instalaciones, y así evitar que se discrimine entre los proveedores y que se prohíban los servicios inalámbricos.

**D.** *Ley para la Reforma del Proceso de Permisos de Puerto Rico*

La Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley 161-2009[29] tiene como propósito crear un marco legal y administrativo para regir la solicitud, evaluación, concesión y denegación de permisos por el Gobierno de Puerto Rico. Dicha ley establece que la solicitud de permisos, recomendaciones, licencias o certificaciones relacionados al desarrollo y uso de terrenos en Puerto Rico se deberá realizar ante la Oficina de Gerencia de Permisos sea a nivel central o regional, Municipios Autónomos con Jerarquía I a V o mediante un profesional autorizado, según aplique.[30] La radicación de la solicitud deberá estar acompañada de un plano con un polígono en formato digital que ilustre la ubicación geográfica, utilizando la metodología seleccionada por la Oficina de Gerencia de Permisos en cumplimiento con las leyes aplicables y el Reglamento conjunto. La Agencia deberá informar si la solicitud está completa en un término no mayor de cinco (5) días laborables desde la presentación de la solicitud, una vez completada o transcurrido el término, la solicitud se referirá para la correspondiente evaluación de la Gerentes de Permisos y del Director de División de Evaluación de Cumplimiento Ambiental

---

[28] *Id.*
[29] Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009, según enmendada, 23 LPRA 9011 nota et seq.
[30] Art. 8.1 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, *supra*, 23 LPRA 9018

que aplique.[31] Por su parte, la evaluación de cumplimiento ambiental es un proceso informal. El secretario auxiliar de la OGPe, realizará determinaciones del cumplimiento ambiental requeridas.[32]

Ahora bien, el Artículo 8.7 de la Ley 161-2009 establece lo siguiente:

> En las solicitudes discrecionales, la Oficina de Gerencia de Permisos emitirá todas sus determinaciones finales por escrito **e incluirá y expondrá en ellas, separadamente, las determinaciones de hecho y conclusiones de derecho que fundamentan su determinación**.
>
> En el caso de las solicitudes ministeriales, la Oficina de Gerencia de Permisos incluirá en el expediente una evaluación de los parámetros aplicables conforme a las leyes y reglamentos vigentes que utilizó para realizar las mismas. Dicha evaluación no requerirá determinaciones de hechos ni conclusiones de derecho. La determinación final advertirá del derecho a solicitar la revisión de la misma con expresión de los términos correspondientes para solicitar dicha revisión. Cumplido este requisito, comenzarán a correr dichos términos. En el caso de las determinaciones finales relacionada al proceso de recalificación de terrenos, la misma contendrá: (a) una advertencia clara del derecho a solicitar revisión judicial y el término disponible para ello; y (b) la advertencia clara de la fecha de vigencia de las recalificaciones.[33] (Énfasis nuestro)

Por otro lado, el artículo 9.10 nos habla sobre la certeza de los permisos, en específico señala que:

> Se presume la corrección y la legalidad de las determinaciones finales y de los permisos expedidos por la Oficina de Gerencia de Permisos, por el Municipio Autónomo con Jerarquía de la I a la V y por los profesionales autorizados. **No obstante, cuando medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún otro delito en el otorgamiento o denegación de la determinación final o del permiso, o en aquellos casos en que la estructura represente un riesgo a la salud o la seguridad, a condiciones ambientales o arqueológicas, la determinación final emitida y el permiso otorgado por la Oficina de Gerencia de Permisos, por el Municipio Autónomo con Jerarquía de la I a la V o**

---

[31] Art. 8.4 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, *supra*, 23 LPRA 9018c

[32] Art. 8.5 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, *supra*, 23 LPRA 9018d

[33] Art. 8.8 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, *supra*, 23 LPRA 9018g

**por el Profesional Autorizado, deberá ser revocado.**
La estructura se podrá modificar, conservar o demoler, sólo después de que un Tribunal competente así lo determine y siguiendo con el procedimiento judicial establecido en el Capítulo XIV de esta Ley, además de cumplir con el debido proceso de ley.[34] (Énfasis nuestro)

A tenor con lo antes mencionado, la otorgación de un permiso goza de una presunción de corrección y legalidad. No obstante, el permiso deberá ser revocado si se demuestra que dicha infraestructura representa un riego a la salud y seguridad a condiciones ambientales.

### E. *Reglamento Conjunto 2020*

El Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, mejor conocido como Reglamento Conjunto 2020, tenía como propósito unificar, en un orden lógico todas las reglas aplicables al uso la expedición de permisos.[35] Por su parte, el Capítulo 9 regula todo lo referente a los proyectos de construcción, instalación y ubicación de torres. El propósito principal es "establecer normas y procedimientos necesarios para la obtención de autorizaciones y permisos para los proyectos de instalación y ubicación de torres, así como establecer criterios para lograr la compatibilidad de las torres con las áreas adyacentes a su ubicación y para proteger la seguridad y salud de los residentes de las comunidades adyacentes"[36] Es bajo esa premisa que este reglamento prohíbe lo siguiente:

No se permitirá la instalación y ubicación de torres y de instalaciones de telecomunicaciones en:

---

[34] Art. 9.10 de la Ley para la Reforma del Proceso de Permisos de Puerto Rico, *supra*, 23 LPRA 9019i

[35] En *Martínez Fernández v. OGPe,* 2023 TSPR 75, 212 DPR ___ (2023) el Tribunal Supremo de Puerto Rico invalidó y declaró nulos los Reglamentos Conjuntos del 2019 y 2020 con efecto prospectivo al 16 de junio de 2023. Al momento de la evaluación y expedición de los permisos del caso de marras este último estaba vigente.

[36] Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, Reglamento Núm. 9233, Departamento de Estado, 2 de diciembre de 2020, pág. 356

a. Un radio de cuatro (4) millas del emplazamiento del Centro de Radio-astronomía (Observatorio de Arecibo) según establecido mediante la Ley Núm. 88 de 14 de junio de 1960, según enmendada.

**b. Terrenos clasificados como susceptibles a deslizamientos por el Servicio Geológico de los Estados Unidos del Departamento del Interior (USGS).**

c. Estructuras designadas por la JP como sitio o zona histórica, en los centros fundacionales de los pueblos, entiéndase las plazas de recreo y bloques circundantes

d. No se permitirá la construcción de estas instalaciones en áreas ubicadas dentro del cauce mayor.[37] (Énfasis Nuestros).

Por otro lado, la sección 9.11.4.2 establece que cualquier cambio o alteración estructural a la torre o la instalación de nuevas instalaciones de telecomunicaciones deberá solicitar permiso ante el OGPe, cuando aplique deberán obtener la recomendación de la Comisión Federal de Comunicaciones y la Agencia Federal de Aviación.[38] Por otra parte, la sección 9.11.10.2 regula las enmiendas a los planos de los permisos de la siguiente manera:

a. Los planos de construcción de obras de infraestructura de telecomunicaciones que hayan sido previamente certificados bajo las disposiciones de este Reglamento pueden enmendarse antes o después de haberse iniciado la obra siempre que el profesional presente la solicitud de enmienda correspondiente a través del sistema electrónico de radicación de la OGPe.

b. Los planos revisados deberán integrar los cambios solicitados, debidamente certificados para su aprobación. En este plano se debe indicar en qué consisten los cambios.

c. Si las enmiendas incluyen cambios en la carga propuesta u otros cambios que afecten las condiciones

---

[37] *Id.*, pág. 661.
[38] *Id.*

de conexión, se deberá radicar una nueva Solicitud de Recomendaciones antes de radicar la enmienda solicitada.

d. La alteración o cambio particular propuesto en la enmienda no podrá realizarse hasta tanto la OGPe apruebe la enmienda solicitada. La OGPe emitirá la enmienda una vez obtenga la recomendación sobre los cambios solicitados.[39]

De otro modo, en cuanto a las variaciones la sección 9.11.11 señala que:

**Se podrán solicitar variaciones a los requisitos dispuestos en el reglamento para la instalación o ubicación de torres y de instalaciones de telecomunicaciones cuando estas respondan a exigencias tecnológicas, de emergencia o de seguridad pública y se cumpla con las siguientes disposiciones:**

a. La variación sea solicitada por el dueño en la propiedad o su representante autorizado en el formulario que se designe para dichos propósitos.

b. Se someta un Memorial Explicativo en el que se discuta si se cumple con uno o más de los criterios establecidos en esta Sección que justifica autorizar la variación solicitada.

c. Se someta un estudio de las alternativas consideradas para atender la variación solicitada y señalar las razones por las cuales la alternativa seleccionada es la que mejor responde al interés público.

d. Se acompañe a la solicitud de variación la recomendación por escrito del NET en el que se señalen los factores que ameritan dicha recomendación.

**e. La celebración una vista pública es mandatoria previo publicación de un aviso de prensa anunciando la celebración de la misma en un periódico de circulación general.**

f. En caso de autorizarse la variación solicitada, el dueño de la torre estará obligado a mantener una póliza de seguro de responsabilidad pública no menor de un millón de dólares. ($1,000,000.00) a favor del Gobierno de Puerto Rico y de la Entidad Gubernamental Concernida estatal o municipal con titularidad sobre los terrenos donde ubique o discurra.[40]

---

[39] *Id.*, pág. 678.
[40] *Id.*, pág. 679.

**F. *Reglamento para Proyectos de Construcción, Instalación y ubicación de Torres y Facilidades de Telecomunicaciones***

El Reglamento para Proyectos de Construcción Instalación y ubicación de Torres y facilidades de telecomunicaciones, reglamento Núm. 6721[41] tiene como función principal fiscalizar la autorización de permisos para la instalación de las torres de telecomunicaciones y de esta manera crear criterios que salvaguarden la salud y seguridad de los residentes adyacentes.

Ante ello, en la sección 2.00 se define Alteración Estructural de la siguiente forma:

> Todo cambio en los elementos estructurales de una torre o estructura existente, tales como: paredes de carga, columnas, vigas y techos o toda adición, extensión, aumento o variación en tamaño de los elementos estructurales existentes o la construcción en el edificio o en la torre de nuevos elementos estructurales adicionales tales como: techo, vigas, columnas o paredes de carga o de aquellos elementos que aunque no son estructuras, afectarían el comportamiento dinámico de las estructura en caso de sismo.[42]

Por otra parte, en su sección 3.03, este Reglamento señala que:

> **3.03 Prohibiciones** - No se permitirá la instalación y ubicación de torres y de facilidades de telecomunicaciones en:
>
> 1. En un radio de cuatro (4) millas del emplazamiento del Centro de Radio-astronomía (Observatorio de Arecibo) según establecido mediante la Ley Núm. 89 de 14 de junio de 1960, enmendada.
>
> 2. En terrenos Clasificados como susceptibles a deslizamientos por el Servicio de Conservación de Recursos Naturales del Departamento de Agricultura Federal (NRCD, por sus siglas en inglés).[43]

Siendo ello así, en específico la sección 3.04 establece lo siguiente:

---

[41] Reglamento para Proyectos de Construcción, Instalación y Ubicación de Torres y Facilidades de Telecomunicaciones (Reglamento de Planificación Núm. 26), Reglamento Núm. 6721, Departamento de Estado, 14 de noviembre de 2003.

[42] *Id.*, pág. 5.

[43] *Id.*, pág. 16.

**3.04 Variaciones** - Se podrá autorizar variaciones a los requisitos dispuestos en este Reglamento para la instalación o ubicación de torres y de facilidades de telecomunicaciones, cuando éstas respondan a exigencias tecnológicas, de emergencia o de seguridad pública y se cumpla con las siguientes disposiciones:

1. La variación sea solicitada por el dueño de la propiedad o su representante autorizado en el formulario que se designe para dichos propósitos.

2. Se someta un Memorial Explicativo en el que se discuta si se cumple con uno o más de los criterios establecidos en esta Subsección que justifica autorizar la variación solicitada.

3. Se someta un estudio de las alternativas consideradas para atender la variación solicitada y señalar las razones por las cuales la alternativa seleccionada es la que mejor responde al interés público.

4. Se acompañe a la solicitud de variación el endoso por escrito de la JRTPR en el que se señalen los factores que ameritan dicho endoso.

5. **La celebración una vista pública es mandatoria previo publicación de un aviso de prensa anunciando la celebración de la misma en un periódico de circulación general y en uno regional o local de lugar donde se propone ubicar la torre.**

6. En caso de autorizarse la variación solicitada, el dueño de la torre estará obligado a mantener una póliza de seguro de responsabilidad pública no menor de un millón de dólares ($1,000,000.00). (Énfasis nuestro). [44]

III.

Por estar intrínsecamente relacionados entre sí, discutiremos en conjunto los tres (3) planteamientos de error traídos ante nuestra consideración.

En el recurso ante nos, los Recurrentes señalan la comisión de varios errores alegadamente cometidos por la DRA-OGPE. Primeramente, alegan que la agencia no debió otorgar una enmienda al permiso de construcción de una torre de telecomunicaciones que pretende triplicar el área de terreno a ser impactada y cuadruplicar la cantidad de corteza terrestre a ser

---

[44] *Id.*, págs. 16-17.

removida cuando este terreno fue catalogado como susceptible por la USGS, violentado así la sección 9.11.2.3 (B) del Reglamento Conjunto 2020 sin siquiera celebrar una consulta de ubicación para variación. Adicionalmente señalan que, la agencia erró al concluir que la solicitud de QMC cumple con las disposiciones para que la solicitud fuera considerada como una enmienda cuando esta no cumple con los requisitos específicos de la sección 9.11.4.2 del Reglamento Conjunto 2020. Por último, arguyen que debido a la magnitud de la enmienda solicitada lo correspondiente era solicitar un nuevo permiso de construcción en cumplimiento con las secciones 9.11.4.2 y 9.11.10.2 del Reglamento Conjunto 2020.

En diciembre de 2021, OGPe otorgó un permiso de construcción de torre de telecomunicaciones en favor de QMC Telecom LLC, compañía de construcción contratada por Liberty. Así las cosas, luego de una inspección realizada a la obra, los Recurridos solicitaron enmienda al permiso original el 1 de septiembre de 2022. Según se desprende del memorial explicativo, acompañado a la solicitud de enmienda, era necesaria la modificación del tipo de fundación a ser utilizada a micro-pilotes, además de la reubicación de las losas de piso en hormigón dentro del área arrendada y el aumento en el área del movimiento de tierra de 426.13 metros cuadrados a 930.00 metros cuadrados, por lo que el área de impacto aumentó a 1,558.43 metros cuadrados aproximadamente. Ante ello, el 15 de diciembre de 2022, la OGPe autorizó la propuesta de cambio estructural que solicitó Liberty. Los Recurrentes sostienen que estas enmiendas violentan lo establecido por los Reglamentos, a lo que le asiste la razón. Nos explicamos.

Según lo anteriormente discutido, la Ley Núm. 161-2009 establece un marco legal para la solicitud de permisos en Puerto

Rico. En su artículo 9.10 se establece que los permisos otorgados tienen presunción de corrección y legalidad. No obstante, los permisos pueden ser revocados si se demuestra que medió fraude, dolo extorción, soborno o la comisión de algún otro delito en el otorgamiento o denegación de la determinación final del permiso **o en aquellos casos en que la estructura represente un riesgo a la salud y seguridad, a condiciones ambientales o arqueológicas.**

Por otra parte, el Reglamento Conjunto 2020 unifica en un orden lógico todas las reglas aplicables para la expedición de permisos. En cuanto a la construcción de torres de telecomunicaciones el Reglamento señala que no se permitirá la instalación de torres en terrenos clasificados como susceptibles a deslizamientos por USGS. Ahora bien, en la sección 9.11.11 establece que podrán solicitar variaciones a los requisitos dispuestos en el reglamento para la instalación de torres telecomunicaciones cuando estas respondan exigencias tecnológicas, de emergencia o de seguridad pública. Además deberán cumplir con los siguientes requisitos: (a) sea solicitada por el dueño de la propiedad; (b) se someta un memorial explicativo en el que se discuta si se cumple con uno o más de los criterios establecidos en esta sección que justifican autorizar la variación solicitada; (c) se someta un estudio de las alternativas consideradas para atender la variación solicitada y señalar las razones por la cuales la alternativa seleccionada es la que mejor responde al interés público; (d) se acompañe a la solicitud de variación la recomendación por escrito del NET en el que se señalen los factores que ameriten dicha recomendación; **(e) la celebración de una vista pública es mandatoria previo publicación de un aviso de prensa anunciando la celebración de la misma en un periódico de circulación general;** y (f) de

autorizarse la variación solicitada, el dueño de la torre estará obligado a mantener una póliza de seguro de responsabilidad pública no menor de un millón de dólares.

Inicialmente, la prohibición a la construcción de torres de telecomunicaciones en terrenos susceptibles a deslizamientos que establece el Reglamento Conjunto 2020 está atada al reporte de la USGS. Por lo tanto, se debe partir de la premisa de que considera los límites que el propio reporte admite y la salvedad que realiza al asegurar que es una guía general y que no sustituye el estudio específico de los terrenos. **Siendo así, dicha prohibición requiere lógicamente que la OGPe evalúe la susceptibilidad a deslizamientos, tomando en cuenta dicho informe y estudios específicos del terreno.** Lo contrario a esto sería que la agencia ignore su propio reglamento lo cual nos llevaría a determinaciones arbitrarias, irrazonables e ilegales.

A tenor con lo anterior, estando el terreno de construcción catalogado como susceptible a deslizamientos lo correspondiente es solicitar una variación a los requisitos dispuestos en ese Reglamento para la instalación de las torres y cumplir con lo establecido en dicha sección. Es por lo anterior que, entendemos que los errores señalados fueron cometidos por la agencia, esto debido a que los cambios estructurales solicitados ameritaban la solicitud de un nuevo permiso debido a que la alteración estructural solicitada era sustancial y correspondía realizar un nuevo estudio del terreno ya que, como bien establece el propio reglamento, existe una prohibición de construcción en terrenos catalogados como susceptibles. Ante ello, se debió cumplir con los requisitos mencionados para la solicitud de la variación, los cuales entre ellos exigen la celebración de una vista pública, la cual no se realizó.

Por otra parte, es importante señalar que, si bien es cierto que la expedición de un permiso de construcción tiene una presunción de corrección y legalidad, no es menos cierto que esta puede ser revocada cuando se demuestra que la seguridad, salud o condiciones ambientales puedan verse afectadas. Adicionalmente, en las solicitudes discrecionales, la OGPe deberá emitir todas sus determinaciones finales por escrito e incluir en ellas, las determinaciones de hecho y conclusiones de derecho que fundamentan. Del expediente administrativo surge que ni el permiso original otorgado ni la enmienda realizada cumplieron con lo establecido por el reglamento, ya que estos no contienen determinaciones de hechos ni conclusiones de derecho que fundamenten la expedición del permiso.

Es ante este análisis que determinamos que la agencia no cumplió con lo establecido en su propio reglamento al aprobar la construcción de una torre de telecomunicaciones en un terreno clasificado como susceptible según la USGS y, además, incumplir con los requisitos para la solicitud de la variación al no celebrar las vistas públicas requeridas.

IV

Por los fundamentos antes expresados, los que hacemos formar parte de este dictamen revocamos la determinación recurrida emitida por la DRA-OGPe.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La Juez Domínguez Irizarry concurre sin voto escrito. La Jueza Rivera Marchand concurre con voto escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

| | | |
|---|---|---|
| ERNESTO RIVERA BURGOS, PURIFICACIÓN RIVERA, ERNESTO RIVERA RIVERA Y MARÍA T. RIVERA RIVERA<br><br>Recurrentes<br><br>Vs.<br><br>DEPARTAMENTO DE DESARROLLO ECONÓMICO Y COMERCIO, OFICINA DE GERENCIA DE PERMISOS (OGPe); AT & T MOBILITY OF PUERTO RICO (AHORA LIBERTY PUERTO RICO)<br><br>Recurridos | KLRA202300201 | *REVISIÓN ADMINISTRATIVA* procedente de la Oficina de Gerencia de Permisos (OGPe)<br><br>Revisión número:<br><br>2023-472218-SDR-011389<br><br>Caso número:<br><br>2020-323102-PCOC-028873<br><br>Sobre:<br><br>Permiso de Construcción para Facilidad de Telecomunicaciones |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, la Juez Rivera Marchand y el Juez Cruz Hiraldo.

## VOTO CONCURRENTE DE LA JUEZA RIVERA MARCHAND

En San Juan, Puerto Rico, a 23 de febrero de 2024.

Respetuosamente concurro de la determinación mayoritaria por entender que procede resaltar la aplicabilidad de la Ley Número 89-2000 conocido como *Ley sobre la Construcción, Instalación y Ubicación de Torres de Telecomunicaciones,* según enmendada (27 LPRA sec. 321 y ss) así como lo resuelto en el dictamen emitido correspondiente al recurso KLRA2021000084 cuyo *Mandato* fue expedido el 21 de julio de 2021.

La Ley Núm. 89-2000, *supra,* propende a un balance de intereses, entre la regulación de la construcción de torres de telecomunicaciones, la seguridad y los derechos de los ciudadanos. Véase además *Mun. de San Sebastián v. QMC Telecom,* 190 DPR 652,



---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución de la Juez Waleska I. Aldebol Mora.

Número Identificador

SEN2024 _____

666. Para lograr lo anterior, se estableció como política pública la ubicación de antenas de telecomunicaciones en una misma facilidad y la armonización de las necesidades de cobertura de las empresas de telecomunicaciones con los intereses de la ciudadanía. *Íd.* De la Exposición de Motivos de la Ley 89-2000 surge que, no se puede limitar ni menoscabar el reclamo de personas y comunidades sobre la seguridad de sus propiedades y su salud personal ante estos tipos de torres de telecomunicaciones. Cónsono con lo anterior, el Tribunal Supremo interpretó el alcance de la palabra "seguridad". Dispuso y citamos: "[p]or otro lado, al hablar de *seguridad* nos referimos necesariamente al *riesgo* de un daño que en mayor o menor grado sea real, pues nadie razonablemente busca protección de aquello que no tiene la posibilidad de producirnos un perjuicio." *Mun. de San Sebastián v. QMC Telecom*, supra, pág. 683. Añádase a ello que, del historial del estatuto surge y citamos: "Propósito. El art. 3 de la Ley de Junio 6, 2000, Núm. 89, dispone (a) [...](b)[...](c) "La proliferación de torres que albergan antenas en zonas urbanas o en las cercanías de residencias crea desasosiego y temor por la seguridad y vida de dichos titulares y requiere de legislación que armonice los intereses comerciales con el de los titulares y requiere de legislación que armonice los intereses comerciales con el de los ciudadanos de modo que se logre una convivencia sana y una mejor calidad de vida.[...]". Lo antes, para evitar la proliferación de torres en la isla y salvaguardar la seguridad en lugares, como ocurre en el caso de autos, susceptibles de deslizamientos.

Dentro de este contexto expuesto en el referido estatuto especial, reitero mi postura que, los permisos para torres de telecomunicaciones no son meramente de fácil verificación y constituidos por la vía ministerial. Nos encontramos ante un permiso de naturaleza discrecional que según dispone la normativa expuesta, requiere de un proceso con vistas con amplia

participación ciudadana, que debería resultar en un permiso en el cual, se consignen determinaciones de hecho y derecho. No hacerlo propende a que se evade la revisión judicial y el acceso a la justicia, trastocando así el fin de nuestro ordenamiento administrativo.

Ciertamente coincidimos con la mayoría en que, como cuestión de derecho, la enmienda recurrida no procede. Ahora bien, soy de la opinión que tampoco la parte recurrida continuará contando con un permiso original que entiende que goza de validez y finalidad porque nunca fue impugnado. De un análisis sosegado de las leyes aplicables y en particular a la intención legislativa de la ley especial sobre la construcción de torres de telecomunicaciones, nos encontramos ante un permiso de naturaleza discrecional que según dispone la normativa antes expuesta, requiere para su finalidad la consignación de determinaciones de hecho y derecho.

**MONSITA RIVERA MARCHAND**
**JUEZA DE APELACIONES**