Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| MARÍA M. RAMOS VEGA Y OTROS<br><br>Apelante<br><br>v.<br><br>HOSPITAL PAVÍA SANTURCE Y OTROS<br><br>Apelado | KLAN202400982 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2023CV00277<br><br>Sobre: Impericia Médica |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 16 de diciembre de 2024.

Comparecen la señora María M. Ramos Vega, el señor Jariel Ortiz Ramos y la señora Betzaida Ortiz Centeno (apelantes) y nos solicitan la revocación de la *Sentencia* que el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario) notificó el 3 de octubre de 2024. En esta, el TPI desestimó, por la vía sumaria, la demanda de epígrafe sobre impericia médica.

Por los fundamentos que exponemos a continuación, confirmamos el dictamen apelado.

**I.**

El 11 de enero de 2022, el señor Benito Ortiz Centeno (señor Ortiz Centeno) procuró atención médica en el Hospital Pavía en Santurce, por síntomas relacionados a la enfermedad infecciosa conocida como COVID-19. Luego de recibir ciertas evaluaciones y servicios médicos, fue dado de alta a las 12:27 a.m. del día siguiente. El 14 de enero de 2022, el señor Ortiz Centeno acudió a otro hospital en donde falleció, el 16 de enero de 2022.

Número Identificador

SEN2024 _____

Los apelantes instaron la *Demanda*[1] de epígrafe sobre impericia médica, en contra del Hospital Pavía Santurce, Inc.,[2] *Emergency Physician Providers, LLC* y otros.[3]

En esencia, los apelantes reclamaron el resarcimiento de los daños y perjuicios sufridos tras el fallecimiento del señor Ortiz Centeno. Alegaron que, ante la negligencia del Hospital Pavía y de sus médicos que, por no ingresarlo el día en que acudió a dicha institución en búsqueda de servicios y tratamiento médico contra el COVID-19, el señor Ortiz Centeno acudió en estado crítico a otro hospital en donde falleció. Destacaron que, el señor Ortiz Centeno era de alto riesgo por su condición física y su edad. Expusieron que, el haberle ordenado el alta sin un referido previo a un internista y sin recibir el tratamiento disponible a esa fecha, el hospital y los médicos faltaron a su deber de ejercer un cuidado razonable, según los requisitos y estándares reconocidos en la profesión médica. A su entender, el descuido y la negligencia del Hospital Pavía y de sus médicos fueron las causantes de la muerte del señor Ortiz Centeno.

En reacción, el 26 de mayo de 2023, el doctor Castro Cintrón acreditó su contestación a la demanda.[4] Negó la mayoría de las alegaciones en su contra y levantó como defensa afirmativa la inmunidad y los límites de responsabilidad que proveen el *Public Readiness and Emergency Preparedness (PREP) Act,* 42 U.S.C.A. §247d-6d *et seq.,* y/o el *Coronavirus Aid Relief, and Economic Security (CARES) Act of 2020,* Ley Pública 116-136 del 27 de marzo

---

[1] Apéndice, págs. 34-43. La referida demanda fue posteriormente enmendada a los efectos de añadir como codemandada a *The Medical Protective Company*, compañía aseguradora del Hospital Pavía Santurce, Inc. Apéndice, págs. 57-66.
[2] También referido como Hospital Metro Santurce, Inc.
[3] Las demás partes demandadas son: doctor Moisés O. Ramírez Vega y su esposa desconocida 1 y la Sociedad Legal de Gananciales compuesta por ambos; doctor Ricardo J. Castro Cintrón y su esposa desconocida 2 y la Sociedad Legal de Gananciales compuesta por ambos; John Doe y su esposa desconocida 3 y la Sociedad Legal de Gananciales compuesta por ambos; Aseguradoras Continental Insurance Company; SIMED; PR Medical Defense; Sociedades Profesionales X, Y & Z; Corporaciones X, Y & Z; Personas Desconocidas y Aseguradoras Desconocidas A, B y C.
[4] Apéndice, págs. 51-56.

de 2020. Aseguró que, el tratamiento médico que le brindaron al señor Ortiz Centeno "se ajustó al estado de conocimiento de la ciencia y [a] las prácticas médicas prevalecientes [...] a base del cuadro clínico y [de la] sintomatología expresada [...]"[5]

De otra parte, el 25 de octubre de 2023, Metro Santurce, Inc. h/n/c Hospital Pavía Santurce y su aseguradora, *The Medical Protective Company* (Hospital Pavía) presentaron su *Contestación a Demanda Enmendada* en la cual incluyeron argumentos similares a los que expuso el doctor Castro Cintrón en su alegación responsiva.[6] Separadamente, el doctor Moisés O. Ramírez Vega, acreditó su alegación responsiva. Sin embargo, a solicitud de los apelantes, el foro primario notificó una *Sentencia Parcial* dando por desistida con perjuicio la causa de acción en su contra.[7]

Posteriormente, el Hospital Pavía instó una solicitud de sentencia sumaria. En ella, adujo que procede la desestimación de la totalidad de la demanda, conforme a la inmunidad provista por el PREP Act, *supra*, en casos sobre daños y perjuicios relacionados al COVID 19. Expresamente citó (como precedente persuasivo) lo resuelto en *Caratini-Soto v. Commonwealth of Puerto Rico*, US District Court for the District of Puerto Rico, Civil Case 23-1111.

En su petitorio sumario, el Hospital Pavía propuso 41 hechos incontrovertidos, apoyados con múltiples anejos.[8] En particular,

---

[5] Apéndice, pág. 55.

[6] Apéndice, págs. 67-74. Cabe señalar que, el Hospital Pavía también contestó la demanda original. Apéndice, págs. 44-50.

[7] Entrada núm. 80 en el expediente electrónico del portal del Sistema Unificado de Manejo y Administración de Casos (SUMAC) del Poder Judicial. Con respecto a las causas de acción en contra de Continental Insurance Co., SIMED y PR Medical Defense, el TPI las desestimó sin perjuicio por falta de diligenciamiento del emplazamiento, al amparo de la Regla 4.3(c) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 4.3(c). Entrada núm. 33 en SUMAC.

[8] Apéndice, págs. 76-207.  Junto a su escrito incluyó los siguientes documentos: Anejo 1-Licencia expedida por el Departamento de Salud del Gobierno de Puerto Rico; Anejo 2-Licencias expedidas por el Tribunal Examinador de Médicos de Puerto Rico del Dr. Moisés O. Ramírez Vega y el Dr. Ricardo J. Castro Cintrón; Anejo 3-Federal Register, Vol. 85, No. 52 del 17 de marzo de 2020; Anejo 4-Orden Ejecutiva Núm. OE-2020-020; Anejo 5-Orden Ejecutiva Núm. OE-2020-036; Anejo 6-Federal Register Vol. 88, No. 92 del 12 de mayo de 2023; Anejo 7-Orden Ejecutiva Núm. OE-2023-012; Anejo 8-Récord Médico del Sr. Benito Ortiz Centeno; Anejo 9-Transcripción de Deposición Virtual de la Sra. María M. Ramos

destacó el alcance y la aplicación del PREP Act, *supra,* sobre los hechos del caso de marras. Solicitó la desestimación de la causa ante la presunta ausencia de hechos en controversia y por entender que cumple con todo lo requerido por el referido estatuto para que le aplique la inmunidad estatuida.

Por su parte, los apelantes se opusieron al petitorio sumario, y a su vez, presentaron su propia solicitud de sentencia sumaria.[9] En su escrito, objetaron los hechos números 21, 25 y 41 que propuso el Hospital Pavía aceptando así, como incontrovertidas, las restantes propuestas. Además, en aras de promover la adjudicación de la demanda instada por la vía sumaria, los apelantes presentaron nueve (9) hechos que, a su entender, se encuentran incontrovertidos junto a varios anejos.[10]

Ahora bien, en cuanto a la aplicación del PREP Act, *supra,* a la causa de epígrafe, los apelantes argumentaron que la muerte del señor Ortiz Centeno es una causa de acción ajena a la inmunidad que establecen la ley estatal y la ley federal. Lo antes, toda vez que, su reclamación es ajena a la utilización de contramedidas del COVID-19. Según los apelantes, no está en controversia que, luego de haber practicado la prueba del COVID-19, la cual arrojó un resultado positivo, el Hospital Pavía no utilizó otra medida de control. A su entender, con ello, incumplió con los estándares médicos adecuados para un paciente de 65 años que presentaba comorbilidades. Para sustentar su argumento, citaron la versión traducida al español de la definición de mala conducta intencional, considerada como una excepción a la inmunidad invocada:

---

Vega; Anejo 10-Transcripción de Deposición Virtual del Sr. Manuel J. Pérez Pabón; Anejo 11-Literatura Therapeutics and Covid-19.

[9] Apéndice, págs. 208-314. Con su escrito anejó lo siguiente: Exhibit A-Récord médico 0000356134; Exhibit B-Informe pericial suscrito por el Dr. Manuel J. Pérez Pabón; Exhibit C-Chest Radiography del Sr. Benito Ortiz Centeno; Exhibit D-*Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals;* Exhibit E-Influencia de factores de riesgo sobre mortalidad por COVID-19; Exhibit F-Extracto de deposición (págs. 32-34) de la Sra. María Ramos Vega.

[10] Anejos p. 218-219.

(c) Definición de mala conducta intencional
(1) Definición
(A) En general salvo que el significado de dicho término se restrinja aún más de conformidad con el párrafo (2), el término "mala conducta intencional" deberá, a los efectos de la subsección (d), denotar un acto u omisión que se tome: (i) intencionalmente para lograr un propósito ilícito; (ii) a sabiendas y sin justificación legal o fáctica; y (iii) sin tener en cuenta un riesgo conocido u obvio que sea tan grande que sea altamente probable que el daño supere el beneficio.

(B) Regla de interpretación
El criterio establecido en el subpárrafo (A) se interpretará como el establecimiento de un estándar de responsabilidad que es más estricto que un estándar de negligencia en cualquier forma o imprudencia. 42 U.S.C.A. §247d-6d (c)(1)(A) y (B).

A lo antes, el Hospital Pavía replicó.[11] Destacó que los apelantes no controvirtieron los hechos medulares relacionados a la inmunidad que le confiere el PREP Act, *supra*. Además, sostuvieron que los apelantes fallaron su intento por controvertir los hechos 21, 25 y 41, por lo que no existe impedimento para aplicar el PREP Act, *supra*, y resolver el presente asunto por la vía sumaria, conforme a derecho. Luego de atender las nueve (9) propuestas de hechos promovidas por los apelantes, el Hospital Pavía insistió en que nada de lo expuesto derrotaría la presunción de corrección de los actos médicos, en ausencia de una opinión pericial que contrarreste el informe de su perito, doctor Wilfredo Nieves Colomer, del cual surge que los facultativos cumplieron con los estándares médicos.

En respuesta al petitorio sumario de los apelantes, el Hospital Pavía arguyó que, del TPI no reconocerles la inmunidad, no procede resolver sumariamente este asunto debido a la existencia de controversias materiales y reales sobre el tratamiento ofrecido al señor Ortiz Centeno.

Análogamente, el doctor Castro Cintrón presentó una *Moción solicitando se emita sentencia sumaria a favor de los demandados*

---

[11] Apéndice, págs. 315-329. *Reply in further support to motion for summary judgment and opposition to plaintiffs´ motion for summary judgment.*

fundamentada en la aplicación de inmunidad que aplica a este caso.[12]

Evaluado lo antes, el TPI emitió la *Sentencia* apelada. En esta consignó los siguientes 41 hechos:

1. Del 10 de noviembre de 2020 al 10 de noviembre de 2022, el Hospital Pavía en Santurce contó con licencia emitida por el Departamento de Salud de Puerto Rico para operar como hospital.
2. El Dr. Ricardo J. Castro Cintrón es un médico licenciado y autorizado para ejercer la medicina y la cirugía en Puerto Rico.
3. Efectivo el 4 de febrero de 2020, el Secretario de Salud y Servicios Humanos de los EE. UU. (en adelante, "Secretario") declaró la pandemia COVID-19 como una emergencia de salud pública e invocó la ley PREP para la pandemia de COVID-19.
4. Según la Sección VI de la Declaración del 10 de marzo de 2020, bajo la ley PREP las contramedidas cubiertas incluyen cualquier antiviral, fármaco, biológico, diagnóstico, dispositivo o vacuna utilizado para tratar, diagnosticar, curar, prevenir o mitigar el COVID-19, o la transmisión del SARS-CoV-2 o un virus que mute a partir de él, o cualquier dispositivo utilizado en la administración de dicho producto, y todos los componentes y materiales constituyentes de dicho producto.
5. El Secretario recomendó el uso y administración de contramedidas cubiertas durante la emergencia sanitaria del COVID-19.
6. El Secretario determinó que la población para la cual está vigente la inmunidad de responsabilidad con respecto a la administración o uso de una contramedida incluye a cualquier individuo que use o a quien se le administre una contramedida cubierta. Además, se otorga inmunidad de responsabilidad y demanda a los planificadores de programas cuando la contramedida es utilizada o administrada a esta población.
7. El Secretario determinó que se otorga inmunidad ante demandas y responsabilidad por la administración o uso de una contramedida cubierta sin ninguna limitación geográfica.
8. El 12 de marzo de 2020, la gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, declaró un estado de emergencia como resultado de la pandemia provocada por el brote de COVID-19.
9. Según la Sección 3 de la Orden Ejecutiva OE-2020-036 emitida por la Hon. Wanda Vázquez Garced, gobernadora de Puerto Rico en aquel momento, "Facilidades de Salud" significa cualquiera de los establecimientos que se dedican a la prestación de servicios a la comunidad para diagnóstico, tratamiento y/o atención médica y/o quirúrgica de enfermedades o lesiones y/o tratamiento obstétrico tales como hospitales generales y especiales, Centros de Diagnóstico y Tratamiento, centros de rehabilitación, facilidades de cuidado extendido, hogares de salud, centros de rehabilitación, centro de enfermedades renales, incluyendo unidades de hemodiálisis ambulatoria, centros de cirugía ambulatoria, servicios de salud en el hogar, laboratorios clínicos, facilidades radiológicas, oficinas médicas,

---

[12] Apéndice, págs. 342-361.

clínicas de salud, servicios de telemedicina, servicios médicos a domicilio, departamentos de teleconsulta, entre otros. Además, se entiende por facilidad de salud toda institución dedicada a la prestación de servicios de salud, incluyendo toda facilidad cuyo funcionamiento esté autorizado mediante licencia, certificación o sea aprobado por ley y/o reglamento del Gobierno de Puerto Rico, incluyendo: Ley Núm. 101 de 26 de junio de 1965, según enmendada, y su reglamentación aplicable; y Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, y su reglamentación aplicable.

10. En la Sección 6 de la Orden Ejecutiva OE-2020-036, la gobernadora de Puerto Rico ordenó a todas las instalaciones y profesionales de la salud dirigir sus esfuerzos y coadyuvar en la respuesta del gobierno de Puerto Rico a la emergencia de salud causada por el COVID-19.

11. El Hospital Pavía de Santurce, sus funcionarios, agentes, empleados, contratistas y voluntarios son personas cubiertas bajo la ley PREP porque el hospital es una "persona calificada" autorizada de conformidad con la salud pública y la respuesta a emergencias médicas de la Autoridad con Jurisdicción (el Gobernador de Puerto Rico y el Departamento de Salud) para prescribir, administrar, entregar, distribuir o dispensar Contramedidas Cubiertas luego de una Declaración de emergencia.

12. El Hospital Pavía Santurce también es un "planificador de programas" al que se le otorga inmunidad en virtud de la Declaración del 10 de marzo de 2020 porque supervisa y administra un programa con respecto a la administración, dispensación, distribución, provisión o uso de Contramedidas Cubiertas. Según esta definición, un empleador del sector privado o un grupo comunitario u otra "persona" puede ser un planificador de programas cuando lleva a cabo las actividades descritas.

13. La declaración de emergencia por COVID-19 finalizó el 11 de mayo de 2023, a nivel federal.

14. A nivel estatal, la declaración de emergencia finalizó el 11 de mayo de 2023.

15. El 11 de enero de 2022, el Sr. Benito Ortiz Centeno visitó la Sala de Emergencias del Hospital Pavía en Santurce.

16. Cuando el paciente y su esposa llegaron al Hospital Pavía en Santurce, el hospital contaba con un área exterior o carpa donde se atenderían a los pacientes con síntomas similares a COVID antes de ser llamados para evaluación.

17. A las 7:54 p.m., el Sr. Benito Ortiz Centeno se sometió a una evaluación de triage y sus principales quejas fueron congestión, tos y dolores corporales desde el miércoles anterior a esta visita. Se observó que el paciente había recibido dos dosis de la vacuna contra el COVID-19.

18. Durante el triage se utilizaron instrumentos para registrar la temperatura del paciente (37.2 °C) y la saturación de oxígeno (96%).

19. A las 9:00 p.m., el Dr. Moisés A. Ramírez Vega ordenó la realización de la prueba de Antígeno COVID-19 INBIOS.

20. El Sr. Ortiz Centeno fue evaluado por el Dr. Ricardo Castro a las 10:32 p.m. del 11 de enero de 2022.

21. La evaluación y detección del Dr. Ricardo Castro incluyó tomar el historial clínico del paciente sobre su enfermedad actual, una revisión de sus medicamentos activos, una revisión de sistemas y un examen físico.

22. Debido a sus síntomas, también se le realizó una prueba de antígeno COVID-19 a las 10:55 p.m.

23. El 11 de enero de 2022, a las 11:30 p.m., la prueba de antígeno COVID-19 arrojó un valor "Positivo".

24. Los resultados de la prueba de antígeno COVID-19 también aparecen en las notas de progreso del Dr. Castro.

25. En la Nota de Progreso # 1, se indica que, el 12 de enero de 2022, a las 12:26 a.m., el Dr. Castro dio de alta al paciente a su domicilio en condición estable con un diagnóstico final de COVID-19 Positivo.

26. Dado su diagnóstico de COVID-19, el Dr. Castro también le recetó Prednisona 20 mg, una tableta, PO QD x 5D.

27. El Sr. Ortiz Centeno fue atendido en el Hospital Pavía en Santurce mientras la declaratoria de emergencia a nivel federal y estatal estaba en plena vigencia.

28. El perito de la parte demandante, el Dr. Manuel Pérez Pabón, fue contratado y asignado para revisar los registros médicos de los pacientes en el Hospital Pavía de Santurce y expresar su opinión.

29. El Dr. Pérez Pabón admitió durante su declaración que el Hospital Pavía en Santurce es una institución autorizada para prescribir, administrar y proporcionar pruebas para detectar COVID-19.

30. El Dr. Pérez Pabón admitió durante su declaración que el Hospital Pavía en Santurce es una institución autorizada para recetar, administrar y suministrar medicamentos para tratar el COVID-19 y sus efectos.

31. El Dr. Pérez Pabón admitió durante su deposición que en Puerto Rico los médicos están autorizados a recetar, administrar y proveer pruebas para detectar el COVID-19.

32. El Dr. Pérez Pabón admitió durante su deposición que los médicos en Puerto Rico están autorizados a recetar, administrar y proveer medicamentos para tratar el COVID-19 y sus efectos.

33. El Dr. Pérez Pabón admitió durante su declaración que, en el Hospital Pavía en Santurce, se le administró una prueba de antígeno COVID al paciente, Sr. Ortiz Centeno, con el propósito de diagnosticar COVID-19 o detectar la presencia de COVID19.

34. El Dr. Pérez Pabón admitió durante su declaración que la prueba de COVID-19 realizada en el Hospital Pavía en Santurce fue autorizada por la FDA para ser utilizada durante la emergencia pandémica de COVID19.

35. El Dr. Pérez Pabón admitió durante su declaración que la Prednisona es un corticosteroide aprobado por la FDA.

36. El Dr. Pérez Pabón admitió durante su declaración que la Prednisona es un medicamento utilizado para tratar a pacientes con COVID-19.

37. El Dr. Pérez Pabón admitió que la Prednisona es un medicamento o fármaco utilizado para mitigar, curar o tratar el COVID-19.

38. El Dr. Pérez Pabón admitió además que la Prednisona era uno de los medicamentos que, en enero de 2022, se estaba utilizando activamente para tratar o mitigar los efectos del COVID-19.

39. En la literatura médica utilizada por el Dr. Pérez Pabón para emitir su informe pericial, existe una fuerte recomendación de utilizar corticoides, como la Prednisona, para tratar a pacientes con COVID-19.

40. El Dr. Pérez Pabón admitió que al señor Ortiz Centeno se le recetó Prednisona al ser diagnosticado con COVID-19.

41. El Dr. Pérez Pabón no estuvo de acuerdo en que la prednisona fuera la mejor opción de medicación para tratar a este paciente. (Notas omitidas.)

Ponderadas las leyes y procedimientos judiciales, el foro primario concluyó que:

[...] el Hospital Pavía de Santurce, sus funcionarios, agentes, empleados, contratistas y voluntarios son personas cubiertas bajo la ley PREP, supra, porque el hospital es una "persona calificada" autorizada de conformidad con la salud pública y la respuesta a emergencias médicas de la Autoridad con Jurisdicción (a saber, el Gobernador de Puerto Rico y el Departamento de Salud) para prescribir, administrar, entregar, distribuir o dispensar Contramedidas Cubiertas luego de una declaración de emergencia. Además, el Hospital Pavía también es un "planificador de programas" al que se le otorga inmunidad en virtud de la Declaración del 10 de marzo de 2020 porque supervisa y administra un programa con respecto a la administración, dispensación, distribución, provisión o uso de Contramedidas Cubiertas. Según esta definición, un empleador del sector privado o un grupo comunitario u otra "persona" puede ser un planificador de programas cuando lleva a cabo las actividades descritas.

[...]

Es irrelevante que los demandantes no aleguen que la lesión fue causada "directamente" por la administración de prednisona, sino más bien porque no se administraron otras contramedidas además de la prednisona o en lugar de ella al tratar al paciente como parte de una admisión o mediante una consulta a medicina interna. Los hechos indiscutibles de que el COVID-19 fue diagnosticado y tratado por Hospital Pavía, y que las contramedidas, según lo define la Ley PREP, supra, y los pronunciamientos del Secretario del HHS, se administraron al paciente en el tratamiento de su infección por COVID-19, colocan este caso dentro del amplio alcance de inmunidad conferida por la Ley PREP, supra.

[...]

Específicamente, las reclamaciones de los demandantes se relacionan con el uso y la administración por parte de los demandados de contramedidas cubiertas en su tratamiento de la infección por COVID-19 del Sr. Ortiz. Adicional a ello, en este caso no está presente alegación alguna de mala conducta intencional, y aun de haberlo habido, cualquier demanda de este tipo debe presentarse exclusivamente en el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia. (42 USC sec. 247d-6d(e)(1)). En consecuencia, la demanda en el presente caso debe ser desestimada.

Inconforme, los apelantes acuden ante esta Curia y señalan los siguientes errores:

Resolver que los apelados están cobijados por la inmunidad que le confiere la PREP ante una negligencia que no está relacionada a la administración de medidas por COVID-19 ni contemplada en PREP.

Interpretar que el campo ocupado por la ley PREP que "concede inmunidad contra todos los reclamos por pérdidas causadas por, derivadas de, relacionadas con o resultantes de la administración o el uso por parte de un individuo de una contramedida cubierta", incluye la reclamación por negligencia médico-hospitalaria que surge de eventos separados al uso de medidas y contramedidas establecidas en la ley.

Con el beneficio de los respectivos alegatos del doctor Castro Cintrón y del Hospital Pavía, resolvemos.

**II.**

## A. Doctrina del campo ocupado

Como norma general, los tribunales estatales tienen jurisdicción concurrente con los tribunales federales para atender asuntos que surjan al amparo de las leyes federales. *González v. Mayagüez Resort & Casino,* 176 DPR 848, 856 (2009), citando a *Tafflin v. Levitt,* 493 U.S. 455 (1990). Sin embargo, la jurisdicción es exclusiva ante un asunto de derecho federal que el Congreso haya dispuesto expresamente para ello o si surge claramente de la ley la intención de privar a los foros estatales de autoridad sobre dicho asunto federal. *Íd.*

Nótese que, el Congreso federal puede ocupar el campo en un asunto federal y excluir la regulación local. *Íd.* Cabe señalar que el fin de la doctrina de ocupación del campo es evitar conflictos regulatorios y, con ello, fomentar una política uniforme. *Íd.* Nótese que, las complicaciones jurisdiccionales bajo la doctrina de campo ocupado tienen dos vertientes. La legislativa versa sobre quién tiene la facultad para regular, mediante legislación, determinada materia, hecho o situación. Mientras que, la jurisdicción judicial representa cuál foro (estatal o federal) está autorizado a considerar las controversias suscitadas. *Íd.,* citando a *Rodríguez v. Overseas Military,* 160 DPR 270, 279 (2009).

## B. PREP Act

El PREP Act, *supra,* ofrece una protección de responsabilidad frente a demandas y reclamos cuando quien invoca la inmunidad es una persona cubierta, que utilizó una contramedida en el curso de una actividad recomendada durante la vigencia de la amenaza de salud pública, y que existe una relación causal entre el reclamo y la contramedida ejercida. 42 U.S.C.A. §247d-6d.

Una persona cubierta bajo el PREP Act, *supra,* cobija a los planificadores de programas o a las personas calificadas. 42

U.S.C.A. §247d-6d(i)(2)(B). Los planificadores de programas son las personas que realizan funciones como supervisar o administrar un programa relacionado a la administración, dispensación, distribución, provisión o uso de una contramedida de seguridad, de un producto pandémico o epidémico calificado. 42 U.S.C.A. §247d-6d(i)(6). Mientras que, son personas calificadas bajo el PREP Act, *supra,* los profesionales de la salud autorizados o aquellas personas con facultad para recetar, administrar o dispensar las contramedidas cubiertas. 42 U.S.C.A. §247d-6d(i)(8). Para efectos de esta legislación, persona incluye tanto individuos como corporaciones. 42 U.S.C.A. §247d-6d(i)(5).

De otra parte, el PREP Act, *supra,* define una contramedida cubierta como un producto pandémico o epidémico cualificado, una contramedida de seguridad, una droga,[13] producto biológico o dispositivo autorizado para uso de la emergencia o aquel dispositivo de protección respiratoria que se considere de uso prioritario durante la emergencia de salud pública. 42 U.S.C.A. §247d-6d(i)(1). Además, un producto pandémico o epidémico calificado se refiere, entre otros, a aquella droga, producto biológico o dispositivo manufacturado, utilizado, diseñado, desarrollado para diagnosticar, mitigar, prevenir, tratar o curar una pandemia o epidemia, o para limitar sus efectos dañinos. 42 U.S.C.A. §247d-6d(i)(7).

Sobre el amplio alcance de la inmunidad que acarrea el PREP Act, *supra,* el Tribunal de Apelaciones de Estados Unidos para el Noveno Circuito resolvió lo siguiente en *Maney v. Brown*, 91 F.4th 1296 (9no Cir. 2024):

> The PREP Act does not explicitly define what it means to administer a countermeasure to an individual under § 247d-6d(a)(1). The phrasing "administration to ... an individual of a covered countermeasure" could refer only to the act of physically giving a countermeasure to a particular person— for example, injecting someone with a vaccine shot. However, in § 247d-6d(a)(2)(B), the Act provides that the scope of

---

[13] Según lo define la Sección 201(g)(1) del *Federal Food, Drug, and Cosmetic Act*, 21 U.S.C. 321(g)(1).

immunity under paragraph (1) includes various activities with a causal relationship to the administration of a countermeasure beyond injecting someone with a vaccine. Most significantly, subsection (a)(2)(B) lists several terms, including "administration," without reference to "an individual." This is consistent with the expansive causal relationship the subsection provides; for example, the "design, development," "manufacture," and "distribution" of a vaccine are multiple links removed in the chain of events from the ultimate injecting of an individual with a vaccine. By referring to "administration ... of [a covered] countermeasure," in the context of a list that expands the conduct within the Act's scope of immunity, and without requiring a direct link *to an individual*, subsection (a)(2)(B) broadens the scope of immunity to administrative activities other than the physical act of directly injecting a particular person with a vaccine.

La única excepción a la inmunidad bajo el PREP Act, *supra*, es la muerte o las lesiones físicas graves causadas por la mala conducta intencional, término cuya definición expusimos en el tracto procesal. 42 U.S.C.A. §247d-6d (c)(1)(A) y (B). Cabe resaltar que, durante la vigencia de una declaración de emergencia de salud pública, ningún Estado puede promover o hacer cumplir una disposición que entre en conflicto con algún requisito relacionado a la contramedida cubierta. 42 U.S.C.A. §247d-6d(b)(8).

### III.

En el recurso ante nos, los apelantes impugnan la determinación del foro primario de declarar con lugar el petitorio sumario que instó el Hospital Pavía y, producto de lo antes, desestimar la causa de acción objeto de este pleito. Cabe puntualizar que, al examinar *de novo* el expediente ante esta Curia, en cumplimiento con el deber que nos impone *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118-119 (2015), colegimos que no existen controversias medulares en este caso y procede aplicar el derecho que, a su vez, versa sobre la autoridad del foro primario para adjudicar los méritos de la causa. En particular, debemos resolver como cuestión de umbral si la reclamación objeto de este pleito cae dentro del ámbito del PREP Act, *supra,* a los efectos de dictaminar si aplica la doctrina de campo ocupado.

Según reseñamos anteriormente, el campo está ocupado por el PREP Act, *supra*, ante una reclamación por pérdida, relacionada a la emergencia de salud que ocasionó el COVID-19, causada o derivada de la administración o uso de una contramedida cubierta. Cabe reiterar que, el PREP Act, *supra*, es una legislación federal que concedió inmunidad de responsabilidad y demanda a los demandados de epígrafe, como "personas cubiertas" autorizadas para administrar, entregar, distribuir o dispensar contramedidas cubiertas, tras una declaración de emergencia.

Debemos resaltar que, la aplicación del PREP Act, *supra*, desplaza toda regulación estatal ya que ningún Estado puede establecer, hacer cumplir o mantener en vigor una disposición de ley que entre en conflicto con la declaración de emergencia y que guarde relación con la contramedida cubierta. Es de notar que, la cláusula de prelación del PREP Act, *supra*, aplicó durante el periodo de vigencia de la declaración de emergencia de salud, lo cual en Puerto Rico fue desde el 12 de marzo de 2020 hasta el 11 de mayo de 2023. Por consiguiente, ante unos hechos ocurridos el 11 de enero de 2022, evidentemente el PREP Act, *supra*, estaba en vigor.

Surge del expediente que, en el presente caso, se cumplen todos los criterios necesarios para aplicar la inmunidad bajo el PREP Act, a saber: (1) el doctor Castro Cintrón y el Hospital Pavía son personas cubiertas; (2) la medicación y las pruebas suministradas al señor Ortiz Centeno constituyen contramedidas cubiertas; (3) el reclamo de los apelantes tiene relación causal con el uso de las contramedidas y con el proceder de la parte apelada; (4) las contramedidas adoptadas cualifican como una actividad recomendada; y (5) la contramedida se utilizó durante la vigencia de la declaración de emergencia.

En virtud de lo anterior, el foro primario actuó correctamente al dictaminar que las reclamaciones de los apelantes están

relacionadas con el uso y administración de contramedidas cubiertas, empleadas por los codemandados como parte del tratamiento del señor Ortiz Centeno ante un diagnóstico de COVID-19, según definidas en el PREP Act, *supra.* Por consiguiente, también fue acertada la determinación del TPI de que la presente reclamación cae dentro del ámbito de la inmunidad que dicha legislación confiere.

Análogo al caso de marras y como precedente persuasivo, en *Caratini-Soto v. Commonwealth of Puerto Rico,* supra, el Tribunal Federal para el Distrito de Puerto Rico desestimó la demanda instada en dicho caso debido a que la parte demandada era una "persona cubierta" que implementó contramedidas cubiertas, activando así la inmunidad que provee el PREP Act, *supra.* En el referido caso, las alegaciones de la demanda estaban relacionadas a los presuntos efectos secundarios derivados del suministro de las vacunas contra el COVID-19.

Como vimos, la única excepción a la inmunidad que confiere el PREP Act, *supra,* es una reclamación por muerte o lesión grave causada por mala conducta intencional, lo cual excluye una pérdida producto de un acto negligente o imprudente. 42 U.S.C.A. §247d-6d(c)(1)(B). De igual manera, coincidimos con el TPI en que los apelantes no incluyeron alegaciones que imputaran a los apelados haber incurrido en mala conducta intencional, según tipificado en el PREP Act, *supra.* En cuyo caso y según lo establece dicha legislación, el foro con jurisdicción sería el Tribunal de Distrito de los Estados Unidos para el Distrito de Columbia. 42 U.S.C.A. §247d-6d(e)(1). Los errores señalados no se cometieron.

**IV.**

Por todo lo antes, confirmamos la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones